Good morning. Good morning. May it please the Court. My name is Charles Berwanger. I'm here on behalf of SSA Triminals, Inc. SSA is caught between two unions competing for the same work. It is caught because of its own decisions. Your Honor, if I may, that's a good point, and it opens up an analysis. Its decisions, it moved the super terminal in 2002. It moved the Howard terminal work to the super terminal in October 2002. At that time, it then assigned all the work, the reefer work, to the ILWU. It then moved the Matson work to the terminal, the super terminal, the next month. And it continued to use the ILWU because having two unions do container work at a terminal where one union has jurisdiction over certain containers and another union has jurisdiction over other containers often leads to miscontainers and damaged goods, and that just was not the way to operate a terminal. So the ILWU was assigned the work, and when the Matson terminal was closed, that work came over to the super terminal. The ILWU continued that work. Then Sousa came into the picture with his award in February 2003, I believe it was, and he concluded that the IAM had a right to continue to do the Matson container work based upon prior contracts and practice. And he concluded that to be the case because the IAM's right followed the work. So the Matson terminal work, the container reefer work, came to the super terminal. IAM continued to have the right to service the work there. So now SSA has a problem, has a business problem. It has two competing unions at the same terminal. So the decision was made to move the Matson work away from that terminal, and that decision was made for business reasons. And the two business reasons that drove that decision were, one, Matson was a freight line which was unique. It required the gates to be kept open until five minutes before a ship took off, versus the way other shippers work, and that is you leave the gate, you close the gates 24 hours before the ship leaves. When you leave the gates open until five minutes before the ship leaves, that requires extraordinary efforts by the guards and watchmen and the other workers on the wharf. So the decision was made to move the Matson work to another terminal. The issue then became what terminal. It so happened that the port, and the port owns all the terminals in the Oakland port, the port had available the Howard terminal, which had been closed about 19 months ago. Now, undoubtedly had the port had a terminal which could have been made available to SSA, which was better served as purposes and on better terms, SSA would not have taken the Howard terminal. However, that was a terminal that was made available, and by that happenstance, then the Matson container work is moved to the Howard terminal. The testimony at the ---- Kennedy. Wouldn't it have been fair to assume you were going to get in trouble with the union when you did that? Well, the employer had to make some business decisions. I mean, employers do this all the time, and they sit down with unions and they iron things out. And I think the employer did. The employer ironed out the super terminal problems and ironed out the Matson, the old Matson line was open temporarily, any problems there. But when it moved the work of the Matson container work, and that's all it moved, by the way, to the Howard terminal, the testimony by Mr. Larson is to that effect, that the operation at Howard after it was reopened was the same as the operation at the Matson terminal before it was closed. If I'm answering your question well. So we have then the Matson, the Howard terminal reopened, and the employer, again, based on business considerations, determines that it's fair, it's efficient, it's consistent with the skill set of the unions, and it's economic to assign the Matson container work at the Howard terminal. What you're arguing is you didn't make any culpable decisions. No, precisely. Trying to unload unions. We were just trying to run a business. We have no interest in being in the middle of a union fight. Yes, I mean, it would have been nice if somebody had argued this out before the fight started. Well, unfortunately, we had two arbitration awards, which were the forum for the fight. We have Sousa, who says that the IM's right to service the Matson containers follows those containers. And those containers You say you're stuck between two warring unions, and you go to the NLRB and say, help, we want to avail ourselves of this process that's there. That's precisely what happened. They say no, because you started it. That's precisely right. And we say we did not. We were just trying to run a business. It all started when the super terminal was open to consolidate the operations. And we made a business decision to give the work to ILWU because of the happenstance. ILWU was first on the site. And then we get an award from Sousa that says, no, you can't do it that way. You got to got to you got to give the Matson the the board relied on precedent. What what distinguishes your situation from the precedent the board relied on? Well, the the board cites a recon decision, for example, and a recon. The employer tried to negotiate down the unions of bricklayers wages. The employer had had, I guess, access to another contract, and the contracting agency's contractor said, look, you got to get your wages down. So recon goes to the bricklayers union says, look, we reduce your wages. Bricklayers union says, no, recon's president testifies that I'm going to break that union. I'm going to get it. And so he then starts using an unskilled union to do the, I guess, the placement of non-brick, fire-retardant materials. And that there that then raises the issue that the court in the Ninth Circuit concluded warranted the board an abstaining from exercising jurisdiction. We have not created a union dispute. We have tried to exercise reasonable business judgment. We have relations with the two unions today, and we're trying to maintain union peace. Counsel, is anti-union animus a requirement for the board's declining to take a 10-K dispute? Well, I think that the recon decision would have it, yes. I think more recent Ninth Circuit decisions aren't quite that overt. But I think there has to be some bad deeds by the employer. Well, I think what the board was trying to say here, and I may be wrong about this, they'll certainly have a chance to correct my impression, is that there really isn't a jurisdictional dispute here to begin with, I mean, it's questionable by who's, who owns the containers, that that's how it's been done historically. Well, there is a union dispute over the massive containers at Howard. I mean, pure and simple. The ILWU says it has a right to do the monitoring and the plugging and unplugging work. And the IAM says, lookit, we have Arbitrator Seuss's award that says we have that right. So we have a dispute between the unions, and we have two arbitration awards. Arbitrator Sutliff in November 2004 said that the ILWU Local 75 has a right to monitor the Mattson refrigerator containers at Howard. So you've got two unions with two awards, and you have the employer in the middle. And what's going on right now? I mean, exactly what's happening? The status quo ante is being maintained. The status quo ante is being maintained. ILWU Local 17 is doing the monitoring, and the IAM is continuing to do the plugging and unplugging. So we're, everybody's waiting for this Court's determination. You haven't been able to work it out without the Ninth Circuit? Well, we, I think that this, the Board is really our mechanism for relief. When we have two. Okay. Let's assume that we disagree with you, just for the sake of argument. Where do you go then to sort this all out? Well, I guess we have the IAM threatening job action. Right. And the ILWU has historically not been reticent to exercise job action either. We've got two final and binding arbitration awards, which put us in a bind. So my question is, if the Board's not helping you, if we don't help you, if we go with the Board, where, what do you do? How do you dig out of this? I think we have to keep our fingers crossed. And we're trying to run a business. We don't want to fight with the unions. So, yeah, but what will you do? I mean, will you go to court somehow, or will you sit down with people? What, what happens? Well, I don't know what remedy is available other than the Board, given that we have two final and binding arbitration awards, which interpret the three contracts, or two contracts. We're stuck. You're going to breach one contract or the other. Well, that's certainly not a position we want to be in. So you get involved in collective bargaining, don't you? Well, that may eventually happen. But at this point, again, we have the right to have the Board make a decision whether or not these competing unions are going to be able to work together. Not under 10K. Pardon me? Not under 10K. That's what the Board said. Well, that's what the Board said. They dismissed under 10K. What deference do we owe the Board? I mean, they're telling us how their own operation works. Well, I think the Board ignored a substantial body of evidence. It ignored the fact that the Howard Terminal had received only mats and work, and the SUSA had directed that IAM has a right to that mats and work wherever it goes. And Sutliff says, no, Howard Terminal has historically been serviced by the ILWU. I think we're caught betwixt and between. Mr. Rosenfeld. Pardon me. I hope I've answered the question, Your Honor. Okay. Thank you. David Rosenfeld, on behalf of the machinists, I'll use the remainder of the time. The fact is that you have to keep in mind that what occurs on the waterfront is the ILWU moves these containers, and about that there really is no dispute. Take them off the ship and put them on the dock. If these containers or the mechanized equipment needs to be repaired, it's generally the machinists who do it, but in some terminals the ILWU does it. There's always this friction because when the container, a refrigerator container lands on the dock, it has to be monitored, inspected, and plugged in. And when you get two groups of workers, one who moves it and the other who repairs it, they're always clamoring to say, this is the intersection of our work, we want it. So this monitoring and plugging and unplugging has been the historical meeting point that's created these jurisdictional disputes. And so when SSA combined all of this work at the super terminal for about a year until that kind of blew apart, it assigned this friction work to ILWU Local 75. And then when it made a business decision about which none of us quarreled, to move some of the work back to the Matson terminal, some to the YTI terminal, and the rest back to the Howard terminal, it made a business decision to then take machinists and put them at the Howard terminal where they'd never been before, retain the ILWU for loading and unloading, and you had this friction point. And they made a business decision initially for various reasons to assign that work to our members. It was consistent with the citizen award. It was consistent with being more efficient and economical. And then the ILWU went to Arbitrator Sutliff, who said, sorry, it is a jurisdictional dispute, and that, I think, is critical. When they went to their own arbitrator, Arbitrator Sutliff, he said, yeah, this is a jurisdictional dispute. He said, ILWU Local 75 has a claim to it, and the machinist has a claim to it. But because he's arbitrating under the ILWU agreement, he had no choice but to award the work to the ILWU Local. So now SSA is caught between our demand, Arbitrator Sousa's award, which is still in court to be enforced, and Arbitrator Sutliff's award that you assigned back. They're caught, not out of their choice. Your Honor, Judge Reilly, it was a business decision to move to the Howard Terminal. It was a business decision to continue to do loading and unloading of containers, the maintenance of the containers. But there was this friction point. And you're right. The parties are supposed to readily resolve it. But the reason, because they can't resolve it, 10-K is the manner by which these things get resolved. It's the Board's obligation to, on the merits, decide at this friction point, if the or do my clients and machinists get it, because that gets the employer out of this pickle. If I can just kind of deal with the precedent issue, the Board seems to focus upon the fact that at the Howard Terminal, the IAM had never done the work there before. But all this changes when SSA moves to the Howard Terminal and brings machinists along with them for the first time, creating that friction. And there are plenty of Board cases that have said that you can't determine jurisdiction simply on where physically the work is done, because it is not unusual for business decisions to result in employers taking work and moving it from one location physically to another location, creating a as a result of a business decision, creating a dispute, because one union says, well, that's our work area. Another union says it's our work area. And the D.C. Circuit's decision, what I call the Pelican Pond decision, exactly that, where the employer expands its operation, moves the work to another location, creating a jurisdictional dispute. And so this precedent upon which the Board relied can't be used, because there is a dispute between the parties, the IWU and the IAM, which was not resolved and which SSA was entitled to have resolved by the 10-point procedure. Just tell all the parties. Does it remain does this friction point remain with the IAM members, or does it remain with the IWU members? And let's look at that. But you're asking us to tell the Board to do something different than what it wants to do. Yes. We're asking you to remand this to the Board to decide upon the traditional 10-K factors, area practice, collective bargain agreement, economy and efficiency, employer preference, to use those traditional factors to decide who should get the work, because once they issue that decision, Arbitrator Sutliff's decision, Arbitrator Sousa's decision, the threats and demands of both parties go away. They live with what the Board tells us to do. And precisely what precedent or rules do you want us to use to tell the Board you didn't know what you were doing? What do you want us to rely on?  You know what the question is. I'm sorry. You say, when you don't. You want us to write an opinion that says, hey, Board, you blew it, and here's what we're relying on. We're relying on the fact that it was arbitrary for the Board to say that there was no dispute between the IAM and the IWU. I think that's the standard of appellate review here, was the Board's decision arbitrary, because in the footnote, both Chairman Batista and Member Schomburg both concede that there are legitimate claims by both parties. And once there are legitimate claims by both parties, the Board is obligated to decide. So the precedent is the Board didn't take this. The Board could have. What's your sense of it? You know, I was – I guess it's only fair that having done a number of these cases, but not a lot, because we don't – you know, you don't do a lot of 10-Ks in your career, because, frankly, most of them get resolved. I was surprised and never could figure out why the Board didn't understand. I think the Board misunderstood one important fact here, which was that at the Howard Terminal, it is correct to say that the IAM had never had a jurors – had never claimed to work there, because we'd never done any work there. But what happened that created this problem was SSA decided to move our mechanics to the Howard Street Terminal, something I, the ILW, never objected to, because they recognized that our folks do the maintenance repair work on the containers and the moving equipment. So the Board kind of forgot that there was this – that because our members were now there, this whole past history with the ILW had, quote, jurisdiction over the Howard Terminal was now lost because it created this friction over this one neat point here where the container gets dropped and somebody's got to plug and unplug it and monitor it. So I think they kind of forgot that, and that's why Batista was correct in saying, well, yeah, there is legitimate work claims by both unions, and once you can see there are legitimate work claims by both unions, it is, as a matter of law, a jurisdictional dispute. And if I can just add one comment. When it goes back to the Board where it should be, the ILW is free to argue, well, as a matter of area practice, we've always done the work at Howard Street, but that's only one factor to consider in making the work work. Scalia. Briefly, if we rule against you, how do you think this is going to all play out? Well, there are two choices the unions have. Unfortunately, they're involved in other disputes on the waterfront. Counsel, let's say we've known each other for years, and we got into a hearing beginning Monday on another dispute with another employer. And some of these disputes get ironed out in the long run because both unions figure out here's what we have to do, and sometimes they don't. I mean, theoretically, we can enforce Sousa's award and try to get back pay and damages out of that. Theoretically, we could strike over it. I don't think we'd do that, but it leaves up in the air to be resolved by litigation striking, which is not what 10K was designed to avoid. It was designed to prevent a union from being in the posture of striking or pursuing inconsistent awards, which could lead to payment of back pay by SSA. In the meantime, the containers are plugged in and being maintained. That's correct. In the meantime, the status quo is there. We're all kind of waiting to see what you tell the Board to do or not to do, and then we'll ramp it up or not ramp it up, depending upon what happens. Thank you. Thank you, counsel. We'll hear now from the Board and the IOWU. Good morning. Kai Palenko for the Labor Board. With the permission of the Court, I'd like to reserve five minutes for Intervenor IOWU. I just wanted to clarify a few points before I move on to the substance of my arguments, and that is there are no competing arbitration awards here. The Sousa award that was referenced by counsel for the IAM is only limited to reefer work at the Super Terminal. The dispute here is over reefer work at the Howard Terminal. The Super Terminal was a new terminal where neither union had a past time. There is a dispute, however. There is a dispute. There is a dispute between unions. There's a dispute over who gets the reefer work at the Howard Terminal. And there's an employer in the middle of the dispute. There's an employer in the middle of the dispute. And everybody's poised that we could get strikes, we could get lawsuits, we could get who the heck knows what. And isn't 10K created precisely to try to iron these things out in a rational way with people sitting down, with neutral people around trying to make it go in the right direction? I mean, it seems if you take away all the trees and look at the forest, this is a classic case that's appropriately resolved in this kind of a process, isn't it? No, 10K was not intended to be a board arbitration procedure. 10K was designed to protect innocent employers. What does it say on its face with respect to this particular case? Nothing? I'm sorry. Can you repeat the question? 10K. What does 10K say with respect to this particular case? Reading the statute in a language plain on its face. It says when there's a violation of AP4D because a union has threatened economic action to force the employer to give work to that union as opposed to a different union, then the board is ordered to decide the dispute. And this Court recognized an exception in Recon and in WESCO. Yeah. Recon was really different facts. So you used an interesting word, innocent. Is innocent in the statute anywhere? No, but that's the standard that the board applies and that this Court has accepted. Yeah. And what does it mean, innocent? I mean, they say, hey, we're innocent. We made business decisions, unlike cases where you get employers who are trying to hammer a union. That's culpable. There's no business reason for that. And they're saying, hey, we're just trying to make business decisions here. We don't have any. We're innocent. Why aren't they innocent? They're not innocent because they breached their past practice at the Howard Terminal by assigning reefer work to IAM, who had never done it there. For two decades, ILWU had done that work consistently. I suspect both sides would say that. No, I think they concede that the IAM has never done work at the location of this dispute. And the dispute, by the way ---- Well, that's what you want to call the geographic area of the Port of Oakland, whether it's one pier or ten piers or three terminals or whatever it is. The dispute is not as to who gets the reefer work at the Port of Oakland. As the parties themselves stipulated, it's who gets the reefer work at the Howard Terminal. And it is not limited in any way to any specific containers. It does not say who gets mats and container reefer work at the Howard Terminal. So if we agree with you, which we very well may, I don't know, what's the practical result? What's going to happen between the unions and the employer? Well, it would encourage the parties to sit down and, as you said earlier, hammer it out and engage in collective bargaining. And when ---- presumably when their contracts expire, they could decide who gets to do this specific work. In the interim, they'll just have to live with the situation as they have now for since the Board's decision. Strikes possibility? No. Strikes are not a possibility because, as we say in our brief, both unions have agreed to no-strike clauses and mandatory grievance and arbitration procedures. And that strike can be enjoined under boys' markets. So that is not a possibility. So what they're looking at at worst is sitting down and working it out. Correct. And that's exactly what 10K is designed to do. It's the Board has held, and with this Court's approval, that 10K should not allow an employer to set aside its collective bargaining obligations. It's designed to encourage parties to resort to collective bargaining. And that's precisely what is happening here. The Board would leave it to the parties themselves to figure it out. Getting back to the Sousa award that they claim they're caught in between two arbitration awards, that's simply not the case. The Sousa award, as I said, was limited to the super terminal, and the arbitrator did not say IAM has the right to follow the work wherever it goes, as counsel for IAM said. Rather, it was limited to the super terminal. In fact, the only arbitration award at the Howard terminal, the location of this dispute, is for ILWU. Well, isn't that more likely the result if we were to affirm that the ILWU would have the work based on the latter, on the Sutliff award? It would remain the status quo, as the employer said earlier, and then subject to collective bargaining when the contracts expire. ILWU is doing the work now, and IAM is not, and they're living with that situation. Again, getting back to the innocent employer, the intent here is irrelevant. I mean, whether it was for business decisions or not does not mean that the board was required to decide this dispute under 10K. You don't have to show bad faith. It's based on breach of contract principles. Good faith is not a defense. The ILWU negotiated for and bargained for a contractual work preservation clause that said we have the right to continue to do the work that we've traditionally done. Here, the record is clear that only the ILWU has ever done reefer work at the Howard terminal, which is the work in dispute as the parties themselves stipulated. The board was necessarily constrained by the party stipulation. The board was not asked to divvy up which containers happened to be at the Howard terminal at any given time and award work to specific containers on a container-by-container basis. Indeed, counsel for SSA says that would not work, that one union should do all the work at a terminal. It's a terminal-by-terminal basis. One more point I'd like to make, Your Honor, and that is the parties stipulated to the board that they settled out the dispute over reefer work at other terminals. There was dispute initially at the 10K hearing over super terminal reefer work and Mattson terminal reefer work. But the parties said to the board, we have agreed that IAM will do all reefer work at the Mattson terminal, and ILWU will do all reefer work. The super terminal. The stipulation doesn't affect this litigation. It just means you have two less cases on the docket. Well, it just shows that SSA assigns reefer work based on location. Why they settled, I don't know. But then I don't think it has any bearing on this case. Well, it shows that. It's not settled. It shows that SSA assigns reefer work among the two unions based on location and not based on what is printed on the side of a container that happens to come into the Port of Oakland. Final point is that the board did consider that Mattson containers happened to be at the Howard terminal at the time of the 10K hearing, and they found that fact would not affect the disposition of the case. They said so in their order denying reconsideration. So the board did not glance over any important fact that would warrant this Court to reverse. In fact, the board is owed deference here. They are the expert agency entitled to interpret 10K. There's substantial evidence in the record supporting their factual findings that only ILWU has ever done the work at the location of the dispute, and they weren't arbitrary and capricious in the application of the law. I have a random question for you, and that is, in your brief, you sort of reserve for the future the question whether we can review this order, and there was an embanked decision to that effect from this Court in 1982 saying that we do have appellate jurisdiction to review orders of this kind. Why are you reserving that? I mean, you don't have to answer that, I guess, but it was a curiosity to me. I spent some time thinking about that question. Well, the possibility if we lost, we would not waive that argument on an appeal, and that was only just a preservation of the argument. Is that something the board is doing in every 10K case in this Court, since we seem to be the only ones who take jurisdiction? I'm not aware of that. I can answer that question. Okay. Just curious. Before I let Jacob come on, the D.C. Circuit decision cited by IAM is clearly distinguishable. There, the Pelican Pond case he referred to, the Pelican Pond location was a new location with no past practice. So the employer had to pick which union it's going to give the work to. Here, the employer transferred the mats and containers to the Howard Terminal, and at that location, there was 20 years at least of past practice of the ILWU exclusively doing the work. So that case is distinguishable. If there are no further questions, I'd like to give the rest of my time to my intervener. All right. I think that's fine. Thank you. Thank you. We'll hear from Mr. Rukeyser. Good morning, Your Honors. May it please the Court. I'm Jacob Rukeyser on behalf of Interveners, ILWU Local 75 and ILWU Local 10. I think at the outset, it's important to focus this case on the Recon case that this Court decided not that many years ago. And in Recon, this Court recognized the National Labor Relations Board was the expert in the Federal labor law. Accordingly, the standard of review that this Court and that the other courts in this country use in reviewing board decisions, such as the decision that is at issue in this case, is a differential one. The standard of review for reviewing findings of facts is substantial evidence. And that standard of review, as this Court noted in Recon, says that the findings of fact must be affirmed if the relevant evidence is such that a reasonable mind might accept it as adequate to support a conclusion, even if a court might draw a contrary conclusion were it to be deciding the case de novo or were it to be that the board's conclusions of law is equally deferential. The board's decisions or decisions of law are reviewed under the arbitrary and capricious standard. What that means, as this Board noted in Recon Refractory just a couple of years ago, is that the agency decision will be affirmed unless it is clear that the agency completely overlooked important aspects of the case or that the agency's decision is simply so implausible that it could not be attributed to the agency exercising its expertise honed over many decades. Kennedy. So in your view, what finding or statement of facts are we bound by because they're supported by substantial evidence? That's right. There are a number. First of all is the party's stipulation. The board noted, as counsel for the general counsel has noted, that the parties at this 10-K hearing or at this at the hearing to develop the record stipulated that the work in dispute was reefer work, the monitoring, plugging, and unplugging of refrigerated containers at the Howard Terminal. It was all reefer work at that one location, and that defined the work in dispute. That limited the board's authority and that limited the scope of the issue in dispute. Another fact that the board quite properly relied on and one that was undisputed is that the ILWU is the only union to have ever performed reefer work at the Howard Terminal. This was undisputed. That is prior to SSA's decision to unilaterally change its operation and assign this work to the IAM. It's also undisputed that the IAM had never, prior to SSA's unilateral decision, ever performed this work. I think that it's important here to note that SSA made much of the fact that it may have made this decision for business reasons, that it was not perhaps acting with anti-union animus. Whether or not that is the case, it's very clear from decades of board precedent and from appellate decisions over the decades that there is no intent requirement. A 10-K hearing will be quashed and quashed quite properly if it is shown that the dispute is one of the employer's own making. What do you make of the paragraph that is, I guess, the next to the last text paragraph of the board's decision, which says machinists have also historically performed reefer work under their IAM contract with the SSA, albeit not at the Howard Terminal before July 2004, and since part of that work was for Madsen Terminal and part of the may have a colorable work preservation claim. And then the board goes on to say that the fact that two unions have a work preservation claim doesn't mean that it's a 10-K situation. How does that work logically if there are two work preservation claims by different unions to the same work? How can that not be a 10-K problem? Well, I would add at the outset that I think that under the board precedent, the first inquiry and in many ways the dispositive inquiry is whether the employer created the dispute. But that being said, what I believe this paragraph is and how it should be interpreted by this Court is dicta. It really is a, I believe, a conversation carried out by the board panelists in this decision about issues of interest to the board, but about issues that were not directly before the board in our case. It's dicta. It may be a little inartful, but at the end of the day, it's dicta. The paragraph immediately preceding the paragraph that you quoted is where the board makes its finding and makes its decision. What the board says there, if I may read, is, in light of this precedent, we agree with ILWU that the real dispute in this case is a work preservation dispute over the reefer work performed at the Howard Terminal. That is, the work in dispute as the parties have stipulated. Thank you, counsel. If neither of my colleagues has any other questions, that will conclude our argument in this case. And counsel, you, your side greatly exceeded its time. So I think we'll call an end to the proceedings. And we do appreciate the arguments of all counsel. They've been quite helpful. The case just argued is submitted, and for this morning's session, we stand adjourned.
judges: Beezer, Trott, Graber